**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JOE WINBORN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-CV-00047-RDP** |
| | } | |
| **SUPREME BEVERAGE COMPANY,** | } | |
| **INC.,** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

Before the court is Defendant Supreme Beverage Company, Inc's ("SBC") Motion for

Summary Judgment (Doc. #19), filed on April 9, 2012 and its Motion to Deem Facts Admitted and

Motion to Strike (Doc. #47), filed on September 12, 2012.  The Motion for Summary Judgment has

been fully briefed (Docs. #19-21, 42-46), and was deemed submitted, without oral argument, on

September 12, 2012.  For the reasons discussed below, the Motion for Summary Judgment is due

to be granted.  Additionally, Defendant's Motion to Deem Facts Admitted and Motion to Strike

(Doc. #47) is due to be granted.[1]

**I.      Procedural History**

Plaintiff Joe Winborn ("Winborn") commenced this action by filing a Complaint on January

5, 2011  (Doc. #1), alleging that his former employer, Defendant SBC, violated Title VII of the Civil

---

[1]Plaintiff did not respond to this Motion.  Because Plaintiff did not respond  and because the court finds the motion well-taken, the court  hereby deems Defendant's Initial Statement of Facts paragraphs 38, 49, 51, 52, 53, 57, 58, 62, 64, 65, 68, 82, 85, 88, 92, and 97 admitted for purposes of summary judgment.  Also, the court hereby strikes Plaintiff's additional disputed facts due to noncompliance with the Scheduling Order.  Finally, the court strikes portions of Plaintiff's argument on pages 10, 13, and 14, and strikes paragraphs 27, 28, 30, 32, 34, and 36 of Plaintiff's Affidavit submitted in opposition to Defendant's Motion for Summary Judgment. Where relevant, the court discusses the specifics of these rulings  in Part III of the memorandum opinion.

Rights Act of 1964, as amended, by and through 42 U.S.C. § 1983 and 42 U.S.C. § 1981 by failing to promote him and ultimately terminating his employment because of his race. Plaintiff also alleged state law claims for negligent hiring, supervision, retention, and training and for intentional infliction of emotional distress (or outrage).

Defendant's motion for summary judgment asserts that: (1) Plaintiff's Title VII and Section 1981 failure to promote claims are untimely, or in the alternative, fail because Plaintiff has not established a *prima facie* case of race discrimination based on any promotion decision; (2) Plaintiff's Title VII and Section 1981 termination claims fails because Plaintiff has not established a *prima facie* case of race discrimination in his discharge, or in the alternative, even assuming Plaintiff has done so, he has not established that Defendant's legitimate, nondiscriminatory reasons for terminating him were pretextual; (3) Plaintiff's state law claim of negligent hiring, supervision, retention, and training fail because Plaintiff has not alleged underlying wrongful conduct constituting a common law Alabama tort; and (4) Plaintiff's outrage claim fails because such a claim, based upon alleged race discrimination, does not fall within the three limited circumstances recognized by the Alabama Supreme Court for the tort of outrage.

On April 9, 2012, Defendant filed a brief (Doc. #20) and evidence[2] (Doc. #21) in support of its motion. Plaintiff filed an opposition to the motion on August 30, 2012 (Doc. #44). Plaintiff also filed two affidavits[3] in support of his opposition. (Docs. # 42-43). Defendant filed a reply brief

_____

[2]Defendant submitted the following evidence: Deposition of Joe Winborn and attached exhibits (Exhibit 1); Deposition of Mike Windham and attached exhibits (Exhibit 2); Deposition of James Hall and attached exhibits (Exhibit 3); Affidavit of Suzie Bullock (Exhibit 4); Affidavit of James Hall (Exhibit 5); Deposition of Buster Tate and attached exhibits (Exhibit 6).

[3]Plaintiff submitted two evidentiary submissions: Affidavit of Joe Winborn (Doc. #42) and Affidavit of Kenneth Perry (Doc. #43).

(Doc. #42) and supplemental evidentiary submissions[4] (Doc. #46) on September 12, 2012. Defendant also filed a Motion to Deem Facts Admitted and Motion to Strike (Doc. #47) on September 12, 2012.

## II.   Legal Standards for Evaluating a Summary Judgment Motion[5]

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman,* 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine

---

[4]Defendants submitted the following supplemental evidence: Deposition of James Thornton and attached exhibits (Exhibit 7); and Deposition of Robert Warnick and attached exhibits (Exhibit 8).

[5]Federal Rule of Civil Procedure 56 was amended on December 1, 2010. However, even considering the 2010 amendments, "the standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 Advisory Committee's Note (2010 Amendments).

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)).

If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point

4

out to the district court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.

If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   Relevant Undisputed Facts[6]

### A.   Background

Winborn is an African American male over the age of nineteen.  (Doc. #21, Ex. 1, Winborn Dep. at 12).  SBC is located in Birmingham, Alabama and is a wholesale distributor that sells and delivers beverages, primarily beer and Red Bull, to restaurants and retail outlets.  (Doc. #21, Ex. 5, Hall Aff. at ¶ 2).   Winborn worked with SBC on two different occassions. (Doc. #21, Ex. 1, Winborn Dep. at 27, 31, 34). During his second stint with the company, SBC terminated Winborn's employment on September 28, 2007 for "violation of policies/procedures" following Winborn's unauthorized loading of product onto a delivery truck.  (Doc. #21, Ex. 5, Hall Aff. at ¶ 15; Doc. #21, Ex. 2, Windham Dep. at 93, 104, PEX 5, SBC-WINBORN-000001).

---

[6]If the facts are in dispute, they are stated in the manner most favorable to the nonmoving party.  *See Fitzpatrick*, 2 F.3d at 1115.

**B.     Plaintiff's First Employment with Defendant**

On or about September 4, 2005, Winborn applied for a warehouse position at SBC in Birmingham. (Doc. #21, Ex. 1, Winborn Deo. at 27 and DX 1).  SBC hired Winborn on October 3, 2005 as a forklift driver. (Doc. #21, Ex. 1, Winborn Dep. at 31).  On January 13, 2006, Winborn left employment with SBC to work for Enterprise Car Rental.[7] (Doc. #21, Ex. 1, Winborn Dep. at 34, 39).

**C.     Plaintiff's Second Employment with Defendant**

**1.     Plaintiff's Position/s with Defendant**

On March 23, 2006, Winborn again applied for employment with SBC as a forklift operator. (Doc. #21, Ex. 1, Winborn Dep. at 34 and DX2).  Mike Windham ("Windham"), SBC's Operations Manager over the Birmingham warehouse, interviewed and hired Winborn as a forklift operator on April 4, 2006. (Doc. #21, Ex. 1, Winborn Dep. at 35-36; Doc. #21, Ex. 2, Windham Dep. at 16, 34). Winborn's initial pay rate was $8.75 per hour. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 5).  During his second term of employment with SBC, Winborn reported to Windham and James Collins ("Collins"), the driver supervisor.  (Doc. #21, Ex. 1, Winborn Dep. at 50-51; Doc. #21, Ex. 2, Windham Dep. at 16, 18, 19-20).  Winborn's job duties as a forklift operator included pulling products from the warehouse and placing them on delivery trucks. (Doc. #21, Ex. 1, Winborn Dep. at  54-56).  Winborn would also fill in as a delivery driver as needed. (Doc. #21, Ex. 1, Winborn Dep. at 40-41; Doc. #21, Ex. 2, Windham Dep. at 23).  When he would fill in as a delivery driver, Winborn would drive the smaller delivery trucks because he did not have a commercial drivers'

---

[7]Winborn admits that he was not subjected to any type of discrimination during his first term of employment with SBC. (Doc.#21,  Ex. 1, Winborn Dep. at 39-40).

license. (Doc. #21,  Ex. 1, Winborn Dep. at 23, 41; Doc. #21, Ex. 2, Windham Dep. at 23).  On July

10, 2006, Windham gave Winborn a pay increase from $8.75 per hour to $9.00 per hour. (Doc. #21,

Ex. 4, Bullock Aff. at ¶ 4).

Around the middle of Winborn's second period of employment with SBC, he asked

Windham if he could be a driver.  (Doc. #21, Ex.1, Winborn Dep. at 42-43).  Windham responded

that he would look into it.  (Doc. #21, Ex. 1, Winborn Dep. at 44).[8]  SBC does not have a formal

application process to apply for a promotion to a driver. (Doc. #21, Ex. 1, Winborn Dep. at 42).  On

or about June 11-13, 2007, SBC increased Winborn's pay from $9.00 per hour to $1,050.00 bi-

weekly. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 4).[9]  On or about June 20-22, 2007, Winborn returned

to his position as a forklift operator at his previous pay.  (Doc. #21, Ex. 2, Windham Dep. at 24; Doc.

#21, Ex. 4, Bullock Aff. at ¶ 4).  Winborn was warned at least one time for excessive speeding while

operating the forklift.  (Doc. #21, Ex. 1, Winborn Dep. at 51).

## 2.      Defendant's Policies and Procedures

SBC has a policy against harassment which prohibits, among other things, "any form of

harassment of its employees, whether or not such harassment is unlawful. It is never justifiable to

harass any of our employees because of the employee's race, color, sex religion, national origin, age,

---

[8]Plaintiff attempts to create an issue of fact regarding Windham's response to inquiries about becoming a driver. In his opposition, Plaintiff submits an additional disputed fact that each time he asked to be promoted to bulk driver, Widham told Plaintiff "I'll get back with you."  (Doc. #44, Additional Disputed Facts, ¶ 5). However, Plaintiff cites no evidentiary support for this contention.  Additionally, this portion of Plaintiff's opposition has been stricken due to noncompliance with the Scheduling Order. *See supra* note 1.  Therefore, no issue of fact exists as to this point.

[9]Plaintiff attempts to create an issue of fact regarding his pay increase.  In his opposition, Plaintiff states that he was not promoted at a rate of pay of $1050.00 bi-weekly.  Plaintiff cites paragraph 7 of his Affidavit as support for this statement.  However, paragraph 7 of Plaintiff's Affidavit (Doc. #42) only states that he was not promoted to delivery driver or bulk delivery driver.  It says nothing about the wages earned in this position.  (*See* Doc. #42, ¶ 7).  Furthermore, nothing in Plaintiff's Affidavit disputes that he received wages of $1050.00 bi-weekly for some period of time.  Plaintiff only avers that when he filled in as a driver, his pay remained the same.  (*See* Doc. #42, ¶ 8).

disability, or any other reason." (Doc. #21, Ex. 1, Winborn Dep. at 70-71 and DX4).  On February 17, 2007, Winborn signed an acknowledgment of the fact that he had received, read, and understood SBC's harassment prevention policy. (Doc. #21, Ex. 1, Winborn Dep. at 71 and DX4).  SBC has an Equal Employment Opportunity policy contained in its Employee Handbook which provides, in pertinent part, that "SBC does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, military service, or any other characterstic." (Doc. #21, Ex. 3, Hall Depo. at 27 and PX1, p. 1).

SBC "may use progressive discipline at its discretion."  (Doc. #21, Ex. 2, Windham Dep., PEX 1, p. 42).  SBC has an Employee Conduct and Work Rules policy contained in its Employee Handbook which provides, in pertinent part, that "[e]mployees who break rules such as these may be subject to disciplinary action, up to and including termination of employment: * Theft or inappropriate removal or possession of property ..." (Doc. #21, Ex. 3, Hall Dep. at 27 and PX1, p. 37).

SBC has a Problem Resolution policy contained in its Employee Handbook which provides, in pertinent part, the following: "If a situation occurs when you believe that a condition of employment or a decision that affects you is not fair, you are encouraged to use the following problem resolution steps." (Doc. #21, Ex. 1, Winborn Dep. at 75-76 and DX6; Doc. #21, Ex. 3, Hall Dep. at 27 and PX1, pp. 43-44).  The Problem Resolution policy steps include presenting the problem to the employee's supervisor, and if not resolved, to the Human Resources Department, and if not resolved, then to the General Manager. (Doc. #21, Ex. 1, Winborn Dep. at 75-76, and DX6; Doc. #21, Ex. 3, Hall Dep. at 27 and PX1, pp. 43-44).  SBC's Employee Handbook also contains the Harassment policy separately signed by Winborn in February 2007. (Doc. #21, Ex. 3, Hall Depo. at

8

27, 40 and PX1, pp. 46-47).  On September 7, 2007, Winborn signed an acknowledgment of the fact

that he had received, and was required to read and follow SBC's Employee Handbook.  (Doc. #21,

Ex. 1, Winborn Dep. at 74-75 and DX5).

### 3.     Defendant's Inventory Loss Issues

During 2007, SBC experienced a shrinkage problem in its Birmingham warehouse related

to Red Bull product. (Doc. #21, Ex. 3, Hall Dep. at 228-229; Doc. #21, Ex. 5, Hall Aff. at ¶ 6).  The

inventory counts in the warehouse showed a significant amount of lost inventory. (Doc. #21, Ex. 5,

Hall Aff. at ¶ 6).  Because of the portable nature of SBC's product and the ability of individuals to

illegally sell the product without accounting for the sale to the company, SBC takes precautions to

prevent shrinkage. (Doc. #21, Ex. 5, Hall Aff. at ¶ 7).  Before leaving each morning, each driver

must compare his count to the manager's computer sheet showing the amount of product scheduled

to be on a particular truck. (Doc. #21, Ex. 2, Windham Dep. at 33).  If any additional items are added

to a truck after the driver and manager compare their counts, the additional product is reflected on

the driver's paperwork, and a manager oversees the loading of that additional product onto the truck.

(Doc. #21, Ex. 2, Windham Dep. at 34; Doc. #21, Ex. 3, Hall Dep. at 230).  SBC also put additional

precautions into place. (Doc. #21,  Ex. 5, Hall Aff. at ¶ 8).

SBC required the roll-down doors between the loading area and the warehouse area to remain

closed unless a manager was present to observe the pulling of product.  (Doc. #21, Ex. 3, Hall Dep.

at 237).[10]  James Hall ("Hall"), SBC's Chief Financial Officer, communicated these new procedures

---

[10]Plaintiff attempts to create an issue of fact regarding this procedure.  Plaintiff's opposition states that SBC did not require the roll down doors to remain closed unless a manager was present.  (Doc. #44, Plaintiff's Response to Defendant's Statement of Facts, ¶ 26).  However, the evidentiary support he cites does not support this contention. Plaintiff cites paragraphs 12-14 of his Affidavit.  Paragraphs 13-14 do not speak as to whether SBC required the roll down doors to remain closed unless a manager was present. (*See* Doc. #42, Winborn Aff. at ¶¶ 13-14).  Additionally, paragraph 12 states that "While working at SBC, it did not install new warehouse roll-up doors for added security." (Doc.

to the warehouse management, including Windham and Collins.  (Doc. #21, Ex. 3, Hall Dep. 255; Doc. #21, Hall Aff at ¶ 9).[11]  SBC's management also began arriving early at the warehouse to watch the early morning counting for suspicious activity. (Doc. #21, Ex. 5, Hall Aff. at ¶ 10).  SBC confined the Red Bull product to a specific area of the warehouse. (Doc #21, Ex. 3, Hall Dep. at 229; Doc #21, Ex. 5, Hall Aff. at ¶ 8).  Hall also began watching video from the surveillance system each day to look for suspicious activity in the Red Bull area.  (Doc #21, Ex. 3, Hall Dep. at 229; Doc #21, Ex. 5, Hall Aff. at ¶ 10).

On August 7, 2007, Hall observed Roderick Orr ("Orr") pull back into the warehouse after he had been counted out and was ready to begin deliveries. (Doc. #21, Ex. 5, Hall Aff. at ¶ 11).  Hall observed Orr place his truck so that the security cameras were further blocked, load empty kegs on to his truck and attempt to leave the warehouse with the empty aluminum kegs. (Doc. #21, Ex. 5, Hall Aff. at ¶ 11).  Winborn was also seen in the video.  (Doc. #21, Ex. 5, Hall Aff. at ¶11).

Empty aluminum kegs have value so SBC accounts for them.  (Doc. #21, Ex. 5, Hall Aff. at ¶ 11).  Because Orr was not authorized to remove the kegs from the warehouse, he was terminated on August 7, 2007 for theft of inventory.  (Doc. #21, Ex. 5, Hall Aff. at ¶ 11).  However, Winborn did not move the aluminum kegs in any manner that would have assisted Orr. (Doc. #42, Winborn Aff. at ¶ 18).  Because Hall was not sure if Winborn played a role in stealing the empty aluminum

---

#42, Winborn Aff. at ¶ 12).  This statement does not contradict SBC's position that it required the roll-up doors to remain closed unless a manager was present.  Rather, this statement only asserts that SBC did not install new roll-up doors. Therefore, no genuine issue of material fact exists regarding SBC's contention that it required the roll-up doors to remain closed unless a manager was present to observe the pulling of product.

[11]Plaintiff attempts to create an issue of fact regarding this statement.  However, Plaintiff's response that no manager communicated any such procedure to him during his employment (*See* Doc. #44, ¶ 38), does not dispute the substance of this "fact."  Additionally, Plaintiff testified in his deposition that Collins told him he was prohibited from going into the warehouse unless a manager was present. (Doc. #21, Ex. 1, Winborn Dep. at 57).  Plaintiff also testified that he coud not recall if roll-down doors were to be closed unless a manager was present. (Doc. #21, Ex. 1, Winborn Dep. at 57-58). Therefore, Defendant's Initial Statement of Fact paragraph 38 is deemed admitted.  *See supra* note 1.

kegs, no disciplinary action was taken against Winborn at that time. (Doc. #21, Ex. 5, Hall Aff. at ¶ 11).

### D.     Plaintiff's September 28, 2007 Termination

While watching the surveillance video for September 26, 2007, Hall observed Winborn load Red Bull product onto an empty pallet, load the pallet onto his forklift, and place the product onto a delivery truck. (Doc. #21, Ex. 3, Hall Dep. at 237; Doc #21, Ex. 5, Hall Aff. at ¶ 12).[12]  Despite the fact that the video angle showed a view down the warehouse floor, Hall did not observe  Collins or any other manager supervising any add-on by Winborn. (Doc. #21, Ex. 3, Hall Dep. at  238-240; Doc #21, Ex. 5, Hall Aff. at ¶ 12).  Hall believed that Winborn's activity was suspicious because Winborn went into a prohibited area by himself, pulled product, and loaded it on a truck unsupervised. (Doc. #21, Ex. 3, Hall Dep. at at 238-240; Doc #21, Ex. 5, Hall Aff. at ¶ 13).  Hall believed that Winborn's activity was in direct violation of the directive that had been issued a few weeks before that a manager be present to observe the pulling of product. (Doc. #21, Ex. 3, Hall Dep. at 251; Doc #21, Ex. 5, Hall Aff. at ¶ 13).  Winborn admits he knew that he was prohibited from going into the warehouse area unless a manager was present. (Doc #21,  Ex. 1, Winborn Dep. at 57).

At the time, Windham believed that Winborn placed the Red Bull product on a truck that it was not scheduled to go on, without paperwork, and without supervision.  (Doc. #21, Ex. 2, Windham Dep. at 91, 97, 115, 129).  Also, at the time, Hall and Windham, believed that Winborn placed the Red Bull product on the delivery truck of driver Kenneth Perry.  (Doc. #21, Ex. 1, Winborn Dep. at 116; Doc. #21, Ex. 2, Windham Dep. at 91; Doc. #21, Ex. 3, Hall Dep. at 253).

---

[12]Windham also viewed the video. (Doc. #21, Ex. 2, Windham Dep. at 88, 90).

By the end of the day, Windham knew that the truck on which Winborn placed the Red Bull product belonged to another driver, Derrick Jones ("Jones"). (Doc. #43, Perry Aff. at ¶ 4; Doc. #44, Winborn Aff at ¶ 23). Hall and Windham believed that loading product onto a delivery truck without proper authorization was an indication of a scheme to take property from SBC without authority. (Doc. #21, Ex. 5, Hall Aff. at ¶ 14; Doc. #21, Ex. 2, Windham Dep. at 112-113).

At Hall's direction, Windham terminated Winborn on September 28, 2007, following this incident, for "violation of policies/procedures." (Doc. #21, Ex. 2, Windham Dep. at 93, 104 and PX5, SBC-WINBORN-000001). Windham noted on the Termination Report in "Additional Comments" that "Joe was dismissed for putting product on a truck that wasn't supposed to be there -- just a request to add more product -- This has happened twice now." (Doc. #21, Ex. 2, Windham Dep. at 111 and PX5, SBC-WINBORN-000001). Perry was also terminated on September 28, 2007. (Doc #21, Ex. 2, Windham Dep. at 104). Later that same day, once it was determined that the truck onto which Winborn loaded product was not Perry's, but that of another delivery driver, Windham contacted Perry and rehired him. (Doc. #21, Ex. 2, Windham Dep. at 106-107).

Although Winborn has no knowledge of who replaced him as a forklift operator, (Doc. #21, Ex. 1, Winborn Dep. at 118), the undisputed evidence submitted into the Rule 56 record demonstrates that he was replaced by Antonio Clayton, who is African American. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 5). Winborn did not complain to anyone in upper management at SBC about his termination. (Doc. #21, Ex. 1, Winborn Dep. at 64, 72-73, 80).[13]

---

[13]Plaintiff attempts to create an issue of fact by stating that he did not complain to anyone in management about his termination on the advice of counsel. (*See* Doc. #44, Plaintiff's Response to Defendant's Statement of Facts, ¶ 68). However, this contention and the accompanying evidentiary support from Plaintiff's Affidavit (See Doc. #43 at ¶ 26) does not dispute the substance of the factual statement that Plaintiff did not complain. Thus, Defendant's statement of fact paragraph 68 is deemed admitted. *See supra* note 1.

### E.        Plaintiff's November 14, 2007 EEOC Charge

On November 14, 2007, Winborn filed a Charge of Discrimination with the EEOC. (Doc.#21, Ex. 1, Winborn Dep. at 85-86 and DX7).  Winborn asserted in his EEOC charge that he was subjected to race discrimination and terminated in violation of Title VII. (Doc. #21, Ex. 1, Winborn Dep. at 85-86 and DX7).  Winborn also claimed in his EEOC charge that "in 2007, I was told by Caucasian Supervisor Mike Wyndam [sic] that I could not be promoted to a driver." (Doc.#21, Ex. 1, Winborn Dep. at 85-86 and DX7).  Winborn also contended in his EEOC charge that "[i]n September 2007, I was accused of misloading a truck and shorting it ten cases . . . [and] [m]y employer knew that I did not misload the truck and short it ten cases." (Doc.#21, Ex. 1, Winborn Dep. at 85-86 and DX7).  Winborn further argued in his EEOC charge that SBC "has a pattern of terminating African American employees." (Doc.#21, Ex. 1, Winborn Dep. at 85-86 and DX7).

Winborn believes he was discriminated against because Windham "wouldn't give me my job back and he wouldn't promote me up to a driver." (Doc.#21, Ex. 1, Winborn Dep. at 65).  Winborn also contends he was discriminated against because Chris Phelps ("Phelps") and James Thornton ("Thornton"), Caucasians, were promoted to driver instead of him. (Doc.#21, Ex. 1, Winborn Dep. at 67, 188).  Winborn admits that he does not know anything about Phelps' or Thornton's backgrounds, whether they had any driver experience prior to coming to SBC, or why they were promoted instead of him. (Doc.#21, Ex. 1, Winborn Dep. at 67-68, 175-176).

When hiring drivers, SBC factored in candidates' prior experience, CDL class, and driving record. (Doc.#21, Ex. 2, Windham Dep. at 55).  SBC hired Phelps as a driver on July 26, 2006. (Doc.#21, Ex. 4, Bullock Aff. at ¶ 6).  Phelps has a Class A commercial drivers' license. (Doc.#21,

Ex. 4, Bullock Aff. at ¶ 6).[14]  Prior to working for SBC, Phelps worked as a route sales driver for

Buffalo Rock Company for approximately two years, and as a driver for Cahaba Sand & Gravel for

over four years. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 6).  SBC hired Thornton as a driver on August

30, 2004.  (Doc.#21, Ex. 4, Bullock Aff. at ¶ 10).  Thornton has a Class A commercial drivers'

license. (Doc.#21, Ex. 4, Bullock Aff. at ¶ 10).  Prior to working for SBC, Winborn had worked as

a helper, a fill-in driver, and a forklift operator. (Doc. #21. Ex. 1, Winborn Dep. at 19, 23 and DX1).

In contrast, Winborn did not have a commercial drivers' license at the time he worked for SBC.

(Doc. #21, Ex. 1, Winborn Dep. at 18, 41).

Winborn also believes that his termination was race discrimination because Windham is

white and he is black.  (Doc.#21,  Ex. 1, Winborn Dep. at 68-70).  Winborn admits that he does not

know of any Caucasian employees who were accused of "misloading a truck" and were not

terminated. (Doc. #21, Ex. 1, Winborn Dep. at 116).  From 2006 to 2010, SBC terminated at least

four Caucasian employees for theft of product. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 9).  Winborn

contends that SBC's "pattern of terminating African American employees" is based on the fact that

he, Rod Tate ("Tate"), Collins, and Perry were terminated. (Doc. #21, Ex. 1, Winborn Dep. at 92-

96).

Winborn believes that SBC terminated Tate for trying to get some empty kegs, but does not

have personal knowledge of why he was terminated. (Doc. #21, Ex. 1, Winborn Dep. at 92-96).  The

---

[14]Plaintiff attempts to create an issue of fact by stating in his opposition that Phelps did not have a Class A commercial driver's license on the date he was promoted.  (Doc. #44, Plaintiff's Response to Defendant's Statement of Facts, ¶ 82).  However, this contention contradicts Plaintiff's deposition testimony that he did not know anything about Phelps' background or his qualifications.  Plaintiff cannot create an issue of fact by contradicting his own testimony. *See Van T. Junkins & Assocs., Inc. V. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  Therefore, Defendant's Statement of Fact paragraph 82 is admitted. *See supra* note 1.

next driver hired by SBC at its Birmingham warehouse after Tate was terminated was Rodriguez Deet, who is African American. (Doc. #21, Ex. 4, Bullock Aff. at ¶ 7). Winborn does not know why Collins was terminated. (Doc. #21, Ex. 1, Winborn Dep. at 94).[15]  Collins was terminated for failure to follow company policies and lack of institutional control. (Doc. #21, Ex. 2, Windham Dep. at 131, 149-150 and PX16, SBC-COLLINS-000029).  Tate, an African American, took over Collins' job duties for a period of time. (Doc. #21, Ex. 6, Tate Dep. at 33).

During Winborn's employment at SBC, all of the warehouse workers at SBC's Birmingham warehouse were either African American or Hispanic. (Doc. #21, Ex. 2, Windham Dep. at 20). During 2007, the majority of drivers (31 out of 43) who worked at SBC's Birmingham warehouse were African American. (Doc #21, Ex. 4, Bullock Aff. at ¶ 8).  Winborn believes that SBC condoned and tolerated discrimination because "they was just getting rid of black guys." (Doc. #21, Ex. 1, Winborn Dep. at 104).[16]  Winborn never reported discrimination to anyone at SBC. (Doc. #21, Ex. 1, Winborn Dep. at 110-111).

---

[15]Plaintiff attempts to create an issue of fact regarding his knowledge of why Collins was terminated.  Plaintiff states in his opposition that Collins was terminated for allegedly assisting in what Hall and Windham thought was attempted theft by Plaintiff.  (Doc. #44, Plaintiff's Response to Defendant's Statement of Facts, ¶ 92).  However, Plaintiff testified at his deposition that he did not know why Collins was terminated.  Plaintiff cannot create an issue of fact by contradicting his own testimony. *See Van T. Junkins & Assocs., Inc. V. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  Additionally, the Affidavit cited in support of Plaintiff's contention that he knows why Collins was terminated states that Plaintiff "does not know for certain" why Collins was terminated.  (Doc. #42, ¶ 37).  Therefore, Defendant's Statement of Fact paragraph 92 is admitted.  *See supra* note 1.

[16]Plaintiff attempts to create an issue of fact by offering additional information.  In his opposition, Plaintiff states that he believed SBC condoned and tolerated discrimination because "they was just getting rid of black guys" for little or no reason.  (Doc. #44, Plaintiff's Response to Defendant's Statement of Facts, ¶ 97).  Plaintiff has changed his deposition testimony.  See Doc. #21, Ex. 1, Winborn Dep at 104:3-7 ("Q.  Why do you believe that Supreme condoned and tolerated discrimination in this case?  A.  They was just getting rid of black guys.").  Plaintiff cannot create an issue of fact by contradicting his own testimony. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  As such, Defendant's Statement of Fact paragraph 97 is admitted.  *See supra* note 1.

**IV.   Discussion**

    **A.      Plaintiff's Abandoned Claims**

First, the court will address Defendant's argument that Plaintiff has abandoned the following claims: (1)  Section 1981 and Title VII promotion (Count One); (2) negligent hiring, supervision, training, and retention (Count Two); and (3) outrage (Count Three).  As discussed above, Plaintiff's Complaint alleges Defendant's failure to promote him was discrimination on the basis of his race in violation fo Section 1981 and Title VII.  (Doc. #1, ¶¶ 12, 20).  Plaintiff's Complaint also alleges negligent hiring, supervision, training and retention claims.  (*Id.*, ¶¶ 26-30).  Plaintiff also asserts claims of outrage or intentional infliction of emotional distress.  (*Id.*, ¶¶ 31-33).   Defendant's Motion for Summary Judgment addresses all three claims.  Specifically, Defendant argues that Plaintiff's Section 1981 promotion claim is untimely because Plaintiff did not file the claim within the two-year statute of limitations.  (Doc. # 20).  Defendant argues Plaintiff's Title VII promotion claim fails because Plaintiff did not file a charge of discrimination within 180 days from the date of the last discriminatory act and because Plaintiff has not established *a prima facie* case.  (*Id.*). Defendant also claims Plaintiff's negligent hiring, supervision, training, and retention claims fail because the underlying wrongful conduct does not constitute an Alabama common law tort.  (*Id.*). Finally, Defendant argues that Plaintiff's outrage claim fails because the claim is based on alleged race discrimination, which is not one of the three limited circumstances recognized by the Alabama Supreme Court for the tort of outrage.  (*Id.*).

In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff does not address Defendant's argument that his Section 1981 promotion claim is barred by the two-year statute of limitations.  Plaintiff only argues that the claim is not time barred by failure to file a charge of

discrimination because he should be allowed to "piggy back" the failure to promote claim with the termination charge.  (Doc. #44).  Plaintiff's Opposition also does not address whether he has established a *prima facie* case of failure to promote under Title VII and Section 1981.  (Doc. #44). Additionally, Plaintiff's Opposition does not address the negligent hiring, supervision, training, and retention claims or the outrage claims.  Therefore, Defendant contends these claims have been abandoned.  The court agrees.

Plaintiff's failure to address Defendant's arguments regarding these claims results in abandonment of those claims.  *See e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (affirming summary judgment on claim raised in complaint but not addressed in initial response in opposition to summary judgment); *Brassler, U.S.A.I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (11 th Cir. 1999) ("[A]ssertions made in the pleadings . . . but not made in opposition to summary judgment need not be considered by the district court or the appellate court in ruling on the motion for summary judgment."); *Resolution Trust Corp. V. Dunmar Corp.*, 43 F.3d 587, 599 (11 th Cir. 1995) ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid summary judgment against him.' There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Because Plaintiff has failed to address his Section 1981 and Title VII promotion, negligent hiring, supervision, training, and retention, and outrage claims, the court finds Plaintiff has abandoned them and summary judgment is due to be granted.  Thus, the only claims left for the court to analyze are Plaintiff's Title VII and Section 1981 termination claims.

**B.      Plaintiff's Title VII and Section 1981 Termination Claims**

      **1.      Applicable Substantive Law**

Title VII and Section 1981 race discrimination claims are evaluated using the same analytical framework. *Standard v. A.B.E.I. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and Section 1981] have the same requirements of proof and use the same analytical framework as well; therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").  Thus, the court analyzes Plaintiff's Title VII and Section 1981 termination claims as a single claim for purposes of summary judgment.

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that an adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2747-48 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocations of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 123 S.Ct. 2148 (2003), that model applies only in cases where there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas /Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden of production, the plaintiff must either present substantial evidence which shows (1) that the legitimate

18

reasons offered by the defendant are merely a pretext for discrimination *or* (2) a reasonable jury could conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54; *Desert Palace*, 123 S.Ct. at 2154-55.

### 2.    Plaintiff's Prima *Facie Case*

In order to establish a *prima facie* case of disparate treatment in termination based on race, Winborn must show that: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual inside his protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).   Winborn has failed to establish a *prima facie* case of discrimination because he has failed to establish the fourth element.   The parties do not dispute that Winborn is a member of a protected class, that he was qualified for the forklift operator position, or that he suffered an adverse employment action. The only remaining issue is whether Winborn has demonstrated that he was replaced by someone outside of his protected class or that SBC treated similarly situated employees outside his classification more favorably.   Winborn has not done either.   Therefore, he cannot establish a *prima facie* case.

First, Winborn has not established that he was replaced by someone outside of his protected class. The Eleventh Circuit has held that African American employees cannot establish a *prima facie* case of race discrimination if they cannot show that they were replaced by a Caucasian. *See Hawkins v. Ceco Corp.*, 883 F.2d 997, 984 (11th Cir. 1989) ("Because [the employee] did not show he was replaced by a white, he failed to establish a *prima facie* case.").   Winborn has testified that he does not know who replaced him as a forklift operator.   Furthermore, it is undisputed that SBC hired

19

Antonio Clayton, an African American, to replace Winborn.  (Doc. #21, Ex. 4, Bullock Aff. at ¶ 5).
Therefore, Winborn has not established that he was replaced by someone outside of his protected
class.

Second, Winborn has not established that SBC treated similarly situated employees outside
his classification more favorably.  To determine whether employees are similarly situated for
purposes of establishing a *prima facie* case, "it is necessary to consider whether the employees are
involved in or accused of the same or similar conduct and are disciplined in different ways."
*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Also, "to make a comparison of the
plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the
employees are similarly situated in all relevant respects."  *Id.*  Specifically, the Eleventh Circuit
requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent
courts from second-guessing employers' reasonable decisions and confusing apples with oranges."
*Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  And, "[i]f a plaintiff fails to identify
similarly situated, non-minority employees who were treated more favorably, [his] case must fail
because the burden is on [him] to establish [his] prima facie case." *Jones v. Bessemer Carraway Med.
Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *superseded in non-relevant part on denial of reh'g*, 51
F.3d 1321 (11th Cir. 1998).

Winborn has identified two individuals whom he believes engaged in misconduct similar to
his without being terminated.  First, Winborn claims that Thornton, a Caucasian driver, was accused
of theft of company property and was not terminated.  (Doc. #44).  Second, Winborn also claims that
Phelps, a Caucasian driver, took company money without authorization and also violated SBC's
sexual harassment policy and was not terminated.  (*Id.*).  The court addresses these contentions in

20

turn.

The evidence is undisputed that in April 2005, someone stole $2,000 in cash from Thornton's truck.  (Doc. #45, Ex. 7, Thornton Dep. at 88, 91, 99, 181-188 and PX2).  Because Thornton failed to follow SBC's policy on the proper handling of cash, SBC required him to pay back the money.  (Doc. #45, Ex. 7, Thornton Dep. at 97).  In June 2005, SBC gave Thornton a written warning about being short $975.28. (Doc. #45, Ex. 7, Thornton Dep. at 104 and PX2).  SBC required Thornton to pay the shortage back because he made a mistake on the deposit slip. (Doc. #45, Ex. 7, Thornton Dep. at 105).  Thornton also received written warnings for being late or leaving work early and for damaging the door of a customer.  (Doc. #21, Ex. 9, Windham Dep. at 77).  Additionally, Thornton delivered the wrong product to a customer and was not terminated.  (Doc. #21, Ex. 9, Windham Dep. at 77).

The evidence is undisputed that in February 2007, SBC gave Phelps a written warning for taking "unauthorized loans" from his cash receipts.  (Doc. #21, Ex. 9, Windham Dep. at 243; Doc. #21, Ex. 14, Employee Warning Report).  Phelps's managers did not consider this theft of property because SBC had allowed drivers to accept cash from customers to buy lunch and then have payroll deduct the difference.  (Doc. #21, Ex. 9, Windham Dep. at 244-45).  From 2004 until late 2007, SBC had a policy that allowed drivers to borrow small amounts from cash and pay it back.  (Doc. #45, Ex. 8, Warnick Dep. at 71-73).  Additionally, Phelps was accused of violating SBC's sexual harassment policy.  (Doc. #21, Ex. 2, Windham Dep. at 235-36).  However, it is also undisputed that Winborn has no personal knowledge of the sexual harassment incident involving Phelps.  (Doc. #21, Ex. 1, Winborn Dep. at 155-56).

The court finds this undiputed evidence of misconduct engaged in by Thornton and Phelps

does not create an issue of material fact regarding whether their respective conduct is "nearly identical" to Winborn's misconduct.  Taken in the light most favorable to Winborn, the record indicates that SBC management believed, based on video surveillance, that Winborn may have been involved in theft of product on August 7, 2007.  (Doc. #21, Ex. 5, Hall Aff. at ¶11).  Subsequently, SBC  terminated him for loading a truck unsupervised in violation of company policy.  (Doc. #21, Ex. 2, Windham Dep. at 93, 104 and PX5, SBC-WINBORN-000001).   Winborn has admitted he knew he was prohibited from entering the warehouse area without a supervisor present.  (Doc #21, Ex. 1, Winborn Dep. at 57).

The Eleventh Circuit has elaborated on the level of similarity required between a Title VII plaintiff's conduct and that of a valid comparator. In *Knight v. Baptist Hosp of Miami, Inc.*, the court affirmed summary judgment in favor of the defendant employer where the plaintiff and another employee both had documented absenteeism and tardiness problems. 330 F.3d 1313, 1318 (11th Cir. 2003). Even though the plaintiff and the other employee had problems in both of these areas, the court found "their problems were not of the same nature." *Id.*  Similarly, in *Coar v. Pamco Aeroplex, Inc.*, the Eleventh Circuit found that a Title VII plaintiff failed to present valid comparators when those identified by the plaintiff violated different rules than the plaintiff.  372 Fed. Appx. 1, 3-4 (11th Cir. 2010).

Here, Winborn has presented no facts suggesting that an individual who loaded product unsupervised and who had also been suspected of theft was not terminated.  The comparators cited by Winborn did not load product onto a truck unsupervised in violated of SBC's directive that a manager be present.  Therefore, Winborn has failed to meet his burden of showing that a similarly-situated Caucasian employee who was suspected of theft also engaged in the unsupervised loading

22

of a truck without being terminated.  *See Holifield*, 115 F.3d at 1562; *Maniccia*, 171 F.3d at 1368; *Jones*, 137 F.3d at 1306.  Because Winborn has failed to establish a *prima facie* case, SBC is entitled to summary judgment on Winborn's wrongful termination claim.

### 3.    Plaintiff Cannot Show Pretext

Even assuming Winborn has established a *prima facie* case, which he has not, SBC is still entitled to summary judgment because Winborn has not shown that SBC's legitimate, nondiscriminatory reason for his termination is a pretext for intentional discrimination.  A reason offered may be either objective or subjective if it is premised upon facts that are particular (*i.e.*, clear and reasonably specific).  *Chapman*, 229 F.3d at 1034-35; *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1280 (11th Cir. 2000).  It is emphatically not the court's job to presume or judge whether an employment decision is fair or wise, but only whether it is legal.  *Chapman*, 299 F.3d at 1030, n.19; *see also Pennington v. City of Huntsville*, 251 F.2d 1262 (11th Cir. 2001).  Here, SBC's legitimate, nondiscriminatory reason for terminating Winborn's employment is that Winborn violated company policies by loading a truck unsupervised.  (Doc. #21, Ex. 2, Windham Dep. at 93, 104 and PX5, SBC-WINBORN-000001).

"Where . . . the employer's asserted justification is that the employee violated a work rule, the employee must prove pretext by showing either that she did not violate the work rule or that, if she did, other employees not within the protected class who engaged in similar acts were not similarly treated."  *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1563 (11th Cir. 1987) (citing *Harris v. Plastics Mfg. Co.*, 617 F.2d 438 (5th Cir. 1980)). Winborn has not produced sufficient evidence of a comparator whom SBC treated more favorably.[17]  Accordingly, Winborn

---

[17]*See infra* Part IV.B.2.

must attempt to demonstrate pretext by showing that he complied with the work rule and that the employer knew he had complied. *Sparks*, 830 F.2d at 1563.

The entire basis for Winborn's termination claim is that he was falsely accused of misloading a truck and that the person who terminated him was white.[18]   However, Winborn knew that he was prohibited from going into the warehouse area unless a manager was present. (Doc #21,  Ex. 1, Winborn Dep. at 57).  Moreover, even if Winborn believes he was wrongly accused of misloading a truck, the relevant question is whether Hall and Windham believed, in good faith that Winborn violated SBC policy at the time they made the decision to terminate Winborn.  The proper inquiry is what the decision-makers believed, even if that belief was wrong. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("That the employee did not in fact engage in the misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong."); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that it honestly believed the employee committed the violation.").

The Rule 56 record is undisputed in this regard: at the time they watched the surveillance video, Hall and Windham believed Winborn violated SBC's policy by loading a truck unsupervised. (Doc. #21, Ex. 2, Windham Dep. at 93, 104, 112-113 and PX5, SBC-WINBORN-000001; Doc. #21, Ex. 5, Hall Aff. at ¶ 14).  And, Winborn has offered no evidence to suggest that Hall or Winham

---

[18] *See* Doc. #21, Ex. 1, Winborn Dep. at 69-70 (Q: Well, why did you think that race had anything to do with you being let go? A: Something Mike -- It was just about Mike. Mike Windham. ... Q: Do you think it was race discrimination because he [Windham] was white? A: Yes. ... Q: Any other reasons you thought it was discrimination that he [Windham] let you go, other than he's white and you're black? A: No, sir.).

were motivated by any other reason than what they saw.  Therefore, the undisputed record evidence shows that (1) the employment decision was not itself discriminatory, and (2) SBC decision-makers possessed a good faith belief that Winborn violated the work rule in question.  *See Holmes v. West Palm Beach Hous. Auth.,* 309 F.3d 752, 755 (11th Cir. 2002) ("An employer articulates a legitimate nondiscriminatory reason for termination where the employer had an honest, good faith belief in the reason for termination, even if it turns out that the employer was mistaken in that belief."); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000), *reh'g denied*, 218 F.3d 749 (11th Cir. 2000) ("a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race.").

Accordingly, Winborn cannot show pretext because (1) he cannot demonstrate that he did not violate the policy in question and (2) he cannot produce sufficient evidence of a comparator. Therefore, even if Winborn had established a *prima facie* case of discrimination–and to be clear he has not–SBC is entitled to summary judgment because Winborn cannot show SBC's legitiamte, nondiscriminatory reason for his termination is pretextual.

## V.      Conclusion

For the reasons stated above, there being no dispute as to any material fact, Defendant SBC's Motion for Summary Judgment (Doc. #19) is due to be granted.  A separate order will be entered dismissing all claims.

**DONE** and **ORDERED** this ___8th___ day of November, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE